IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA,        )
                                 )
          Plaintiff,             )
                                 )
vs.                              )        CR NO. 2:06CR271-WKW
                                 )
PRESTON GRICE                    )
and COREY HARVEY,                )
                                 )
          Defendants.            )

**NARRATIVE FACTS and BRIEF AND MEMORANDUM OF LAW
IN SUPPORT OF
MOTION TO SUPPRESS OF DEFENDANT GRICE**

THE FACTS

According to the DEA-6 prepared by Special Agent (SA) Neal Thompson on

November 1, 2005, the information which was relayed by the confidential source was

purportedly that the CS advised SA Thompson and Detective Steelman that Grice obtains

multiple kilograms of cocaine powder and re-distributes in the form of crack cocaine. See

Exhibit 1.

This information as to Grice expands and contracts according to which document and

author one is reading.  The affidavit in aid of the search warrant stated that the house had no

street address and was located at the corner of Holcombe and South Streets (Exhibit 3).

Furthermore, this affidavit stated Grice was cutting the drugs at the residence, but did not

specify how this was learned.  The affidavit further misrepresented that Grice, as a driver of

1

one of the vehicles stopped, threw a large amount of marijuana from the vehicle and that he was then taken into custody. This was a blatant misrepresentation made to the magistrate in implicating Grice's participation in criminal conduct in order to claim probable cause existed to search the residence. See affidavit, Exhibit 3. The true facts were that no drugs were found when Grice was illegally stopped and detained. Furthermore, had the fact that no drugs were found on Grice during his illegal stop and detention been known, then there would have been no facts to establish that Grice had committed any criminal activity to support probable cause as to the residence upon which the magistrate could rely.

The affidavit is vague, non-specific and fails to establish any nexus between Grice, illegal drug activity, the residence and drugs present at the residence once the false statement (Grice throwing a large amount of marijuana from the car) is deleted from the affidavit. Furthermore, the fact that no drugs were found on Grice nor in his vehicle when searched that day was concealed from the issuing magistrate. This information was clearly exculpatory and would have led to a finding that no probable cause existed as to Grice nor Grice's residence.

The investigation was federal from the start, which is important as the DEA-6 (Exhibit 1) alludes to conferences with Assistant U.S. Attorneys, Honorable Kent Brunson and Honorable Clark Morris, that if the objectives of the investigation were met they would seek federal prosecution. This information was concealed from and was not disclosed to the Montgomery city magistrate judge whom executed the search warrant and whom only has

authority to issue warrants for violations of misdemeanors returnable in city court and/or felonies returnable in state court (not federal laws returnable in federal court).

A preliminary hearing was conducted on or about November 7, 2005 before the Honorable Susan Russ Walker, United Stated District Magistrate Judge. Susan James, Esquire, appeared on behalf of Leeandora Woods; Bruce Maddox, Esquire, appeared on behalf of Corey Harvey; and the undersigned counsel, Donald G. Madison, appeared on behalf of Preston Grice. Excerpts from the transcript of said preliminary hearing are attached hereto as Exhibit 4.

Officer Scott Edwards was sworn and questioned by AUSA Clark Morris. Mr. Edwards testified that he was an officer with the Montgomery Police Department and also a task force officer with the HIDTA Task Force (Exhibit 4) [P 6] He also stated that he was with the Special Operations Division Unit Narcotics Bureau.

Mr. Edwards testified as to what information he received on November 1, 2005, stating: "I was informed by Detective Robert Steelman and Special Agent Neal Thompson that they received information from a confidential source that Preston Grice was storing and distributing a large quantity of cocaine from an address on Holcombe Street [Exhibit 4, P 7, L 20, 21], **later identified** as 589 Holcombe Street [Exhibit 4, P 7, L 21-25; P 8, L 1). The officers did not even have an address for the search at the time the search warrant was obtained.

According to Officer's Edwards' testimony this was all of the information which the

alleged CS provided at the time.

Cross examination by Ms. Susan James, Esquire, representing Leeandora Woods, commenced at page 25 of the transcript. Officer Edwards confirmed that it was not the CS whom provided the information about Preston Grice, but that "the CS had heard that Mr. Grice, through a close friend, that they had drugs stored there and that he was still selling the drugs from that residence". [P 6, L 5-9] This was triple hearsay information which failed to establish in any way as to how this other unidentified person could have learned or known the information he was relaying which was provided which resulted in the surveillance of the residence.

Mr. Bruce Maddox, Esquire, on behalf of Corey Harvey, cross examined Officer Edwards and Mr. Edwards confirmed that the information that Officer Steelman received from an informant was basically hearsay from other than the CS and that the informant had stated that someone had told the informant that information. [P 46]   Officer Edwards confirmed that the information did not come from an informant whom was reliable and had personal knowledge having actually viewed something, and that the information was just something that purportedly had been told to the informant by a person other than the CS. Mr. Edwards attempted to state that because Mr. Grice's name was on a database that this also gave the officers reason to believe that there was actually narcotics at the residence [P 47] Mr. Edwards confirmed that at the time he ran the database he had not seen Mr. Grice at the house; furthermore, he had nothing to connect Mr. Grice to the house at that point in time

4

other than the information relayed to the informant (CS) by a separate person. [P 48] Officer Edwards testified that the information which the informant provided was that they (Grice) was allegedly selling crack cocaine from that residence and not marijuana. [P 51]

Officer Edwards confirmed that Mr. Grice was stopped for no traffic violation and was then transported to the narcotics office notwithstanding that no narcotics were found on him nor in his vehicle. Office Edwards confirmed that Mr. Grice was transported to the narcotics bureau before the search warrant was executed.

The undersigned counsel began examination of Mr. Edwards. [P 62] Officer Edwards confirmed that the CS did not have any personal knowledge of anything which transpired as to any of the information which was provided to Detective Steelman and Agent Thompson; he confirmed that the information was three times removed from the original source. [P 63] Officer Edwards confirmed that the only thing which linked Mr. Grice to the residence was the key which he had to the house (seized from Grice after his illegal stop, search and detention). [P 65] Furthermore, when questioned as to whether Mr. Grice had violated any traffic laws when he was pulled over, Mr. Edwards stated that Mr. Grice was stopped "...for investigative purposes." He stated further that "There was no traffic violation that Mr. Grice had committed at the time that he was pulled over."

Mr. Edwards confirmed that the key which was taken from Mr. Grice was seized at the narcotics office after his illegal detention. This is notwithstanding that Grice's keys were taken from him in order that Sergeant Pace could drive Grice's van to the narcotics office

with Grice being illegally detained and driven to the narcotics office by Corporal C.S. Jones (See Jones' statement, Exhibit 2, Bates Stamp 48). Mr. Grice's statement was not taken until after the search had begun and was almost over.

Furthermore, the search warrant for the house was obtained solely as a result of the misrepresentation made about Grice throwing the marijuana from his vehicle when he was stopped. There is no other evidence in the affidavit to support the search.

Finally, the statements of Tarsus Lanier and Leeondora Woods should be suppressed as counsel for said Defendants (Susan James, Esquire) had a conflict of interest between the two clients at the time the proffer statement of Tarsus Lanier was given.

The DEA-6 (Exhibit 6 attached hereto) clearly shows the on December 5, 2005, Tarsus Lanier, whom Susan James was representing, tendered a statement pursuant to a proffer agreement implicating the Defendant Preston Grice.

According to the transcript of the preliminary hearing, Susan James was representing the Co-Defendant Leeandora Woods on a conspiracy charge for which Grice was also charged. Therefore, counsel through a separate client presented a proffer which impacted another of her clients, Mr. Woods, through the conspiracy he was charged in with Grice. The Order dismissing the Indictment against Woods (Co-Defendant to Defendant Preston Grice) was not signed until December 9, 2005, which was four (4) days after the proffer of Tarsus Lanier. Therefore, the two statements were given with an actual conflict of interest which should disqualify the two statements.

<u>BRIEF AND MEMORANDUM OF LAW</u>

## I.    <u>THE GOVERNMENT CANNOT RELY ON AN ANONYMOUS TIP.</u>

The law recognizes that anonymous tips, in and of themselves, should not be used without some other corroborating evidence to support the claim.  <u>Illinois v. Gates</u>, 462 U.S. 213, 1035 S. Ct. 266 (2000).  In <u>Gates</u>, the Supreme Court said "major portions" of the informant's statements must be verified.  <u>Gates,</u> 42 U.S. at 246.  In <u>United States v. Clark</u>, 31 F.3d 831 (9th Cir. 1994), an anonymous, uncorroborated tip containing no information other than the allegation that marijuana was being cultivated, which had no indicia of reliability, was insufficient to establish probable cause that Clark was growing marijuana.

An anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.  <u>Alabama v. White</u>, 496 U.S. 325, 329 (1990).

The exclusionary rule bars the admission of evidence obtained in violation of the Constitution, extends beyond the direct products of police misconduct and evidence derived from the illegal conduct of "fruit of the poisonous tree." <u>Nardone v. United States</u>, 308 U.S. 338, 341, 60 S. Ct. 266 (1939).  The rule applies not only to illegally obtained evidence itself, but also other incriminating evidence derived from the primary evidence.  <u>Nix v. Williams</u>, 467 U.S. 431, 444, 104 S. Ct. 2501 (1984); <u>Wong v. United States</u>, 371 U.S. 471, 83 S. Ct. 407 (1963).  The purpose behind the exclusion is not to remedy the harm suffered by the victim of the illegal search, but rather to defer future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable search and seizure.

United States v. Calandra, 414 U.S. 338, 347, 94 S. Ct. 613 (1974).  The burden of proof is on the government to establish that an exception to the Fourth Amendment requirement exists.  United States v. Jeffers, 342 U.S 48, 51, 72 S. Ct. 93 ( 1951).  No such exception has been identified in Grice's case.  "Anonymous tips are generally less reliable than tips from known informants and can form the basis for reasonable suspicion only if accompanied by specific indicia of reliability."  Gates, 462 U.S. at 238.  The search in the Defendant Grice's case was based on police created conduct that did not comply with procedural rules and was not based on reliable source information.  It cannot, in hindsight, be said that, despite these circumstances, the result satisfies the means.

## II.    THE GOVERNMENT CANNOT MEET THE *U.S. V. LEON* GOOD FAITH EXCEPTIONS AS TO THE AFFIDAVIT AND SEARCH WARRANT.

Additionally, it cannot be said that the good faith exception of United States v Leon, 468 U.S. 897 (1984), exists.  In *Leon*, the Supreme Court recognized a good faith exception to the exclusionary rule for searches conducted pursuant to warrants.  Observing that the purpose of the exclusionary rule is to deter unlawful police conduct, the Court found that this purpose would not be served, and the rule should not be applied, when officers engage in "objectively reasonable law enforcement activity."  468 U.S. at 918-19.  In particular, the Court held that the suppression of evidence would have no deterrent effect "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope."  *Id*, at 920.  Under *Leon*, searches conducted pursuant to warrants will rarely require suppression; however, the *Leon* court did identify four situations in which

8

suppression would still be appropriate. *Id*. At 923. These situations are (1) "if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth," (2) "where the issuing magistrate wholly abandoned his judicial role," (3) where the "warrant [is] based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,'" and (4) where "a warrant [is] so facially deficient...that the executing officers cannot reasonably presume it to be valid." *Id*. (Citations omitted).

The Defendant Grice submits that the first and last two grounds are applicable in this case; being U.S. v. Leon (1) the magistrate was misled by the information misrepresented to him that Grice threw marijuana from the car (which was the only statement of any alleged criminal activity of Grice); (3) that the warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) that the warrant was so facially deficient that the executing officers cannot reasonably presume it to be valid.

The Defendant Grice submits that the test is whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. United States v. Taxacher, *902 F.2d 867 (11th Cir. 1990).* The "good-faith" inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this

determination, all of the circumstances ... may be considered." *Leon,* 568 U.S. at 922 n. 23.

The Defendant Grice respectfully submits that Corporal R.J. Steelman's Affidavit supporting the search warrant was so lacking in any indicia of probable cause as to Grice and the residence to render official belief in the existence of probable cause entirely unreasonable. The Defendant Grice further submits that the court must conclude that a reasonable law enforcement officer could not believe that Corporal Steelman's Affidavit established probable cause for searching the residence at Holcombe Street when reading the affidavit without the misrepresentation as to Grice throwing the marijuana. The Defendant Grice respectfully submits that there were no facts from which a reasonably well trained officer could conclude that evidence was located at the residence based upon what was stated in the Affidavit for the search warrant minus the misrepresented facts as to Grice throwing marijuana from the car.

The first exception applies to the statement in the warrant that Grice threw marijuana from the vehicle upon which statement the magistrate relied to determine probable cause as to Grice. In U.S. vs. Mays, 466 F.3d 335 at 345 (5th Cir. 2006), the Court held:

> "...In evaluating this argument, we apply the standard from *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), which requires a defendant to show that "(1) allegations in a supporting affidavit were deliberate falsehoods or made with a reckless disregard for the truth, and (2) the remaining portion of the affidavit is not sufficient to support a finding of probable cause." *United States v. Brown*, 298 F.3d 392, 395 (5th Cir. 2002). The second prong is often decisive, because even if the defendant proves that a statement was deliberately false or made with reckless disregard of its truth, he would still not prevail if the remainder of the affidavit set forth sufficient facts for a finding of probable cause. *See id.*

10

Without the false statement there are no facts remaining in the affidavit to establish probable cause against Grice and/or as to the residence.

Probable cause to issue a search warrant for illegal drugs may be established on hearsay information of unidentified informants, however, the issuing "magistrate" must be informed of some of the underlying circumstances from which the informant concluded that the drugs were where they claimed and some of the underlying circumstances from which the affiant concluded that the informants were credible or that their information was reliable. In this case, there was no information provided.

## III.    THE GOVERNMENT DELIBERATELY VIOLATED RULE 41, FEDERAL RULES OF CRIMINAL PROCEDURE, IN UTILIZING A CITY MAGISTRATE TO EXECUTE A SEARCH WARRANT FOR A FEDERAL OFFENSE.

Rule 41 of the Federal Rules of Criminal Procedure. "[U]nless a *clear constitutional violation occurs*, noncompliance with Rule 41 requires suppression of evidence only where (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule . <u>United States v. Loyd</u>, 721 F.2d 331, 333 (11th Cir. 1983) (per curiam) (quoting <u>United States v. Stefanson</u>, 648 F.2d 1231, 1235 (9th Cir. 1981) (citations omitted)) (emphasis added). In <u>Loyd</u>, suppression was denied because the violation of Rule 41 did not affect the occurrence or abrasiveness of the search, and there was "no evidence to indicate bad faith or an intentional disregard of the rule."

11

Loyd, 721 F.2d at 333; cf. United States v. Leon, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984) holding that the exclusionary rule is inappropriate when agents executing a search warrant acted in good faith reliance on the validity of the warrant). In order to show prejudice in this context, a defendant must show that because of the violation of Rule 41, he was subjected to a search that might not have occurred or would not have been so abrasive had the rule been followed. United States v. Burke, 517 F.2d 377, 386 (2d Cir. 1975).

This case presents evidence of a deliberate disregard for Rule 41 where it was determined before surveillance began that the case would be federal (see Exhibit 1). Furthermore, it is doubtful that the affidavit in aid of the search warrant would have passed federal judge or magistrate judge review. This would support an intentional and deliberate disregard of the rules.

The search was federal in the sense that federal officers "had a hand in it. Lustig v. United States 338 U.S. 74, 78, 69 S. Ct. 1372 (1949); United State v. Hanson, 469 F.2d 1375 (5th Cir. 1972); Navarro v. United States, 400 F.2d 315 (5th Cir. 1968).

Rule 41(c)(1) states "a warrant shall issue only on an affidavit or affidavits sworn before a federal magistrate or state judge establishing the grounds for issuing the warrant. If the federal magistrate or state judge is satisfied that grounds for the application exists or that there is probable cause to believe that they exist, he shall issue a warrant identifying the property and naming or describing the person or place to be searched..." In Navarro, the Court turned to Justice Frankfurter's opinion in Lusting v. United, 338 U.S. 74, 69 S. T. 1372

(1949) for a definition of a "federal search." The Honorable Justice Frankfurter stated "[t]he crux of that doctrine is that a search is a search by a federal official if he had a hand in it... It is immaterial whether a federal agent originated the idea or joined in it while the search was in progress. So long as he was accomplished, he must be deemed to have participated in it. Where there is participation on the part of federal officers it is not necessary to consider what would be the result if the search had been conducted entirely by State officers." Lustig, 338 U.S. at 78-79.

A municipal judge's signature on a warrant violates Rule 41 of the Federal Rules of Criminal Procedure. Rule 41 specifically states that a magistrate with authority in the district or if none is reasonably available, a judge of a state court of record in the district has the authority to issue a warrant to search for and seize a person or property located within the district. (Rule 41(b)(1)).

## IV.  EVIDENCE SEIZED FROM THE DEFENDANT GRICE'S ILLEGAL STOP AND ILLEGAL DETENTION SHOULD BE SUPPRESSED.

The seizure of the key from Grice resulted after his illegal stop, arrest and detention. Nothing was discovered in Grice's car yet he was seized, detained and taken to police headquarters when there was no evidence that he had committed a crime. The key and all fruits of the use of the key including statements, money and all items seized from the house should be suppressed.

> "A seizure takes place "whenever a police officer accosts an individual and restrains his freedom to walk away." United States v. Rignoni-Ponce, 422 U.S. 873, 878 (1975). Traffic stops qualify as seizures under the Fourth

Amendment.  <u>Delaware v. Prouse</u>, 440 U.S. 648, 653 (1979). ...Colston's testimony establishes that any investigation related to the lane violation ended when he completed the warning citation and gave it to Perkins for his signature...Thus, the continued detention of Perkins and Scott beyond the issuance of the traffic citation, during which Colston repeatedly asked if there were drugs in the car and called in a drug dog, was unlawful.  Since Perkins' consent to the search of the car was the product of an unlawful detention, "the consent was tainted by the illegality and was ineffective to justify the search." <u>Florida v. Royer</u>, 460 U.S. 491, 507-508 (1983)(plurality opinion)."
<u>U.S. v. Perkins and Scott</u>, (11th Cir. App. 2003).

It is clear that the evidence seized from the Defendant Grice occurred during his unlawful detention and was therefore illegally seized requiring suppression.

## V.    GRICE SHOULD HAVE STANDING TO CHALLENGE THE STATEMENT OF WOODS AND LANIER BECAUSE OF THE CONSPIRACY CHARGE MADE AGAINST HIM.

While acknowledging the holding of <u>U.S. v. Padilla</u>, 508 U.S. 77, the Defendant Grice respectfully submits that legal logic dictates that if one does not have standing to challenge the search and possessory interest of drugs attributed to a co-defendant then the converse should be true (i.e, that this Defendant cannot be charged with a possessory interest in the drugs of the Co-Defendant which this Defendant has no standing to challenge).  This may be by judicial estopple or other form of estopple such as inconsistent positions taken in the same judicial proceeding.

As a result, the Government should be judicially estopped from attempting to utilize evidence from Woods to use against the Defendant Grice.

Respectfully submitted,
S/Donald G. Madison
DONALD G. MADISON (MAD008)
Attorney for Defendant Preston Grice
418 Scott Street
Montgomery, Alabama 36104
Telephone (334) 263-4800
Facsimile  (334) 265-8511
E-mail: dgmadison@bellsouth.net

## CERTIFICATE OF SERVICE

I hereby certify that this Brief and Memorandum of Law in Support of Motion to Suppress of Defendant Grice was electronically filed on this the _____ day of December 2006, and that electronic service will be made upon the United States Attorney for the Middle District of Alabama on this _____ day of December, 2006.

S/Donald G. Madison
DONALD G. MADISON (MAD008)
418 Scott Street
Montgomery, Alabama 36104
Telephone (334) 263-4800
Facsimile  (334) 265-8511
E-mail: dgmadison@bellsouth.net

15

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 2

| 1. Program Code | 2. Cross File | Related Files | 3. File No. | 4. G-DEP Identifier |
|---|---|---|---|---|
| 5. By: SA NEILL THOMPSON<br>At: MONTGOMERY, AL | ☐<br>☐<br>☐<br>☐ | | 6. File Title<br>GRICE, Preston | |
| 7. ☐ Closed ☐ Requested Action Completed<br>☐ Action Requested By: | ☐ | | 8. Date Prepared<br>11/01/05 | |

9. Other Officers: MPD Detective Bob Steelman, TFO Scott Edwards

10. Report Re: Case Initiation

### BASIS OF INVESTIGATION

In November 2005, SA Neill Thompson and Montgomery Police Dept. Detective
Bob Steelman were provided information by a Confidential Source (CS)
regarding Preston GRICE and others in Montgomery, Alabama. The CS advised
SA Thompson and Detective Steelman of that GRICE obtains multiple
kilograms of cocaine powder and redistributes it in the form of "crack"
cocaine.

### TARGET(S)

The targets of the investigation will be GRICE and other members of the
organization.

### AUSA CONCURRENCE

Assistant United States Attorney Kent Brunson was contacted regarding this
investigation. AUSA Morris concurred that if the objectives of this
investigation are met she will seek federal prosecution against GRICE and
other members of the organization.

| 11. Distribution:<br>Division<br><br>District<br><br>Other    SARI | 12. Signature (Agent)<br><br>SA NEILL THOMPSON | 13. Date<br>11-1-05 |
|---|---|---|
| | 14. Approved (Name and Title)<br>MARSHALL SIMONS<br>GROUP SUPERVISOR | 15. Date<br>11/1/05 |

DEA Form    - 6
(Jul. 1996)
    NT CASE INITIATION
3 - Originating Office

**DEA SENSITIVE**
Drug Enforcement Administration

DEFENDANT'S EXHIBIT 1

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

000002

U.S. Department of Justice
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| *(Continuation)* | 3. File Title | |
| | GRICE, Preston | |

4.
Page  2   of   2

| 5. Program Code | 6. Date Prepared |
|---|---|
| | 11/01/05 |

### FINANCIAL ASSESSMENT EXPECTATIONS

Efforts will be made to identify and seize all drug proceeds and assets
used to facilitate the illegal drug activity. Methods used in the
financial assessment will include administrative subpoenas, mail covers,
and other means designated as necessary in the investigation.

### INDEXING

1. GRICE, Preston - NADDIS #

**DEA SENSITIVE**
Drug Enforcement Administration

**3 - Originating Office**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned

Previous edition dated 8/94 may be used.

000003

## MEMORANDUM

To:        Lt. D.W. O'Banion

From:      Cpl. C.E. Jones #013

Date:      11-03-05

Subject:   Arrest of B/M Preston Grice and contact with B/M Nathan Wright

On 11-01-05, at approx. 1300 Hrs, Sgt. Pace and myself were instructed to go to the area of Holcomb St. to assist Narcotics in stopping a vehicle. We positioned at S. Court St. and I-085. We were told to stop a black van which had turned east onto Jeff Davis Ave. from Holcomb St, headed toward S. Court. We waited until the vehicle emerged onto S. Court St, turning south, and got behind the vehicle on Jeff Davis Ave, headed east. After the vehicle turned north onto S. Perry St, we activated our emergency equipment and conducted a stop of the vehicle in the parking lot of the B.P. gas station at S. Perry St. and Arba St.

Both occupants were asked to step from the vehicle, a 99 Ford Windstar, Al tag# D06025. The driver was identified as B/M Preston Grice, and the passenger was found to be B/M Nathan Wright. I secured a large knife from between the front seats, and a bow from the back seat. Cpl. Conway arrived and "Luke" conducted a search of the vehicle. Cpl. Conway requested that we transport both subjects and the vehicle to the Narcotics Office. Cpl. Upton assisted us by transporting Wright. I transported Grice and Sgt. Pace drove the van to the narcotics Office, where the subjects and vehicle were turned over to Narcotics investigators.

Cpl. C.E. Jones #013

DEFENDANT'S EXHIBIT 2

STATE OF ALABAMA                    )                    AFFIDAVIT IN SUPPORT OF A
                                    )
COUNTY OF MONTGOMERY                )                    ANYTIME SEARCH WARRANT
                                    )
CITY OF MONTGOMERY                  )                    KNOCK AND ANNOUNCE


BEFORE ME, THE HONORABLE _____, JUDGE OF THE
MUNICIPAL COURT OF THE CITY OF MONTGOMERY, MONTGOMERY, ALABAMA, THE
UNDERSIGNED, CORPORAL R. J. STEELMAN #072, PERSONALLY APPEARED AND
STATED THAT HE IS A DETECTIVE WITH AND FOR THE SPECIAL OPERATIONS
DIVISION, NARCOTICS BUREAU OF THE MONTGOMERY POLICE DEPARTMENT,
MONTGOMERY, ALABAMA AND HE HAS REASON TO BELIEVE THAT COCAINE, A
CONTROLLED SUBSTANCE, IS BE STORED AND SOLD AT A RESIDENCE WITH NO
VISIBLE NUMBERS LOCATED IN THE 500 BLOCK OF HOLCOMBE STREET,
MONTGOMERY, ALABAMA. THE RESIDENCE IS DESCRIBED AS BEING A WHITE
SINGLE STORY DWELLING, LOCATED ADJACENT TO TWO VACANT LOTS AT THE
CORNER OF HOLCOMBE AND SOUTH STREET. THE RESIDENCE FACES WEST ON
HOLCOMBE STREET. THIS IS IN VIOLATION OF THE CODE OF ALABAMA, 1975,
SECTION 13A-12-231.

THE FACTS TENDING TO ESTABLISH THE FOREGOING GROUNDS FOR ISSUANCE OF
AN ANYTIME, "KNOCK AND ANNOUNCE", SEARCH WARRANT ARE AS FOLLOWS:

PROBABLE CAUSE BEING THAT ON 11/01/2005 AT APPROXIMATELY 1145 HOURS, THE
MONTGOMERY POLICE DEPARTMENT NARCOTICS BUREAU RECEIVED INFORMATION
FROM AN ANONYMOUS SOURCE THAT A TRAFFICKING AMOUNT OF COCAINE WAS
BEING STORED AT A RESIDENCE WITH NO VISIBLE NUMBERS LOCATED IN THE 500
BLOCK OF HOLCOMBE STREET, MONTGOMERY, ALABAMA. THE ANONYMOPUS TIP
IDENTIFIED THAT PRESTON GRICE AND OTHER SUBJECTS WERE "CUTTING" THE
DRUGS AND THAT A BLACK CADILLAC AND A DARK COLORED MINIVAN WERE
PARKED IN FRONT OF THE RESIDENCE. THE TIP FURTHER IDENTIFIED THE
RESIDENCE AS BEING NEXT TO TWO VACANT LOTS AT THE CORNER OF HOLCOMBE
AND SOUTH STREET.

FURTHER PROBABLE CAUSE BEING THAT ON 11/01/2005 AT APPROXIMATELY 1230
HOURS, THE SPECIAL OPERATIONS DIVISION CONDUCTED SURVEILLANCE ON THE
RESIDENCE AND OBSERVED A BLACK CADILLAC GTS AND A BLACK MINI VAN
PARKED AT THE RESIDENCE. DURING THE SURVEILLANCE, A B/M, LATER IDENTIFIED
AS LEENANDORA WOODS DOB: 04/09/1977 , WAS OBSERVED LEAVING THE RESIDENCE.
THIS WRITER OBSERVED THE DEFENDANT PLACE A PLASTIC BAG IN THE BLACK
CADILLAC AND LEAVE THE RESIDENCE AT A HIGH RATE OF SPEED.

FURTHER PROBABLE CAUSE BEING THAT A TRAFFIC STOP WAS CONDUCTED ON THE
BLACK CADILLAC GTS. DURING THE TRAFFIC STOP, A TRAINED NARCOTICS DOG

DEFENDANT'S EXHIBIT 3

000026

HANDLED BY DETECTIVE CONWAY ALERTED THAT NARCOTICS WERE IN THE VEHICLE. WOODS THEN FLED ON FOOT FROM THE VEHICLE. APPROXIMATELY ¼ TO ½ KILOGRAM OF COCAINE WAS LOCATED IN THE VEHICLE CONSOLE.

FURTHER PROBABLE CAUSE BEING THAT DURING THE STOP OF LAWRENCE WOODS, THE BLACK MINI VAN LEFT THE RESIDENCE AT A HIGH RATE OF SPEED. A TRAFFIC STOP WAS CONDUCTED ON THE VEHICLE AT WHICH TIME THE VEHICLE FLED. DURING THE VEHICLE PURSUIT, THE DRIVER THREW A LARGE AMOUNT OF MARIJUANA FROM THE VEHICLE. THE DRIVER WAS TAKEN INTO CUSTODY AND IDENTIFIED AS PRESTON GRICE, DOB: 08/24/1973.

THE FOREGOING IS BASED ON THE PERSONAL KNOWLEDGE OF THIS AFFIANT, OTHER MEMBERS OF THE NARCOTICS BUREAU AND FACTS OBTAINED BY THE MONTGOMERY POLICE DEPARTMENT NARCOTICS AND INTELLIGENCE BUREAU, MONTGOMERY, ALABAMA, AND IS MADE FOR THE PURPOSE OF SECURING AN ANYTIME "KNOCK AND ANNOUNCE" SEARCH WARRANT FOR THE DWELLING DESCRIBED AS BEING A WHITE SINGLE STORY DWELLING, LOCATED ADJACENT TO TWO VACANT LOTS AT THE CORNER OF HOLCOMBE AND SOUTH STREET. THE SEARCH WARRANT IS FOR COCAINE, AND ANY OTHER CONTROLLED SUBSTANCES, TO INCLUDE: DRUG PARAPHERNALIA, RECORDS OF DRUG TRANSACTIONS, DRUG BUY MONIES, WEAPONS AND ANY ITEMS LISTED IN ATTACHMENT I: ALSO TO INCLUDE ANY PERSONS LOCATED AT THE RESIDENCE AND ALL COMMON AREAS, OUTBUILDINGS, AND VEHICLES LOCATED WITHIN THE CURTILAGE THEREOF.

SWORN TO AND SUBSCRIBED BEFORE ME THIS ___1st___ DAY OF __NOVEMBER____ , 2005.

CPL. R. J. STEELMAN #072
SPECIAL OPERATIONS DIVISION
NARCOTICS AND INTELLIGENCE BUREAU
MONTGOMERY POLICE DEPARTMENT
MONTGOMERY, ALABAMA

MUNICIPAL JUDGE
MUNICIPAL COURT
CITY OF MONTGOMERY
MONTGOMERY, ALABAMA

000027

## ATTACHMENT I

1. Controlled, dangerous substances and related paraphernalia.

2. Books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, purchase and distribution of controlled substances.

3. Papers, tickets, notes, schedules, receipts, and other items relating to domestic and international travel.

4. Books, records, receipts, bank statements and records, money drafts, letters of credit, money order and cashier's checks, receipts, pass books, bank checks, safe deposit box keys, and other items evidence of the obtaining, secreting, transfer, concealment and/or the proceeds of illegal drug trafficking.

5. United States currency, precious metals, jewelry, and financial instruments, including stocks and bonds in amounts indicative of the proceeds of illegal drug trafficking.

6. Photographs, in particular, photographs of co-conspirators, of assets and/or controlled substances.

7. Receipts for items evidencing the expenditure of the proceeds of drug distribution, including, but not limited to, clothing, furniture and electronic equipment.

8. Paraphernalia for packaging, cutting, weighing, and distributing controlled substances, including, but not limited to, scales, baggies, spoons, walkie-talkies, CB's, night vision devices, police scanners, binoculars and parabolic microphones.

9. Indicia of occupancy, residency, and/or ownership of the premises, including, but not limited to, utility and telephone bills, keys and cancelled envelopes.

10. Firearms

11. Computers, disks, CD's, including, but not limited to, items used to store or transmit materials, recipes or proceeds used in the manufacture, distribution or possession of illegal drugs.

## SEARCH WARRANT

STATE OF ALABAMA     )        ANYTIME SEARCH WARRANT
                       )
COUNTY OF MONTGOMERY )      KNOCK AND ANNOUNCE
                       )
CITY OF MONTGOMERY    )

TO ANY SHERIFF, DEPUTY, AND/OR MUNICIPAL OFFICER OR CHIEF OF POLICE:

Proof of affidavits, which are attached hereto and incorporated by reference, having been made this

day before me, by <u>Corporal R. J. Steelman #072, of the Special Operations Division, Narcotics</u>

<u>Bureau, with the Montgomery Police Department.</u>  You are hereby commanded to make immediate

search of:

<u>White single story dwelling adjacent to two vacant lots in the 500 block of Holcombe Street. The</u>

<u>address is further identified to be located at corner of Holcombe Street and South Street with a</u>

<u>chain link fence, MONTGOMERY, ALABAMA, ANY PERSON, OUTBUILDINGS</u>

<u>AND VEHICLES LOCATED WITHIN THE CURTILAGE THERE OF.</u>

for the following property <u>Cocaine, Marijuana and any other controlled substances, U.S. Currency,</u>

<u>records of drug sales, drug paraphernalia, computers, items described within this affidavit, items</u>

<u>listed in  Attachment I.</u>

And if you find the same or any part thereof, to bring it forthwith before me, at my office at

Municipal Court, Montgomery County, Alabama; or if the said warrant is issued for violation of a

state law return the same to any State Court.

Dated this   1st   day of   November   , 2005.

                                        JUDGE, MUNICIPAL COURT
                                        CITY OF MONTGOMERY
                                        MONTGOMERY COUNTY
                                        MONTGOMERY, ALABAMA

_____

_____

**THE CITY OF MONTGOMERY**

**MONTGOMERY COUNTY**

_____

_____

SEARCH   WARRANT

_____

_____

TIME ENTERED:   1430

TIME EXITED  :   1610

THIS __1__ DAY OF ___Nov___.
2005.

_____

**SHERIFF OR CHIEF OF POLICE**

_____
**DEPUTY OR MUNICIPAL OFFICER**

FILED IN OFFICE THIS _____ DAY OF

_____, 2005.

_____

CLERK

000030

Grice1~1

```
 1              IN THE UNITED STATES DISTRICT COURT
                             FOR
 2              THE MIDDLE DISTRICT OF ALABAMA

 3

 4

 5    THE UNITED STATES
         OF AMERICA
 6
              vs.                          CRIMINAL ACTION NO.
 7                                         2:05-MJ-137-SRW
      PRESTON GRICE,
 8    LEEANDORA WOODS,
      COREY HARVEY
 9

10

11

12              DIGITALLY RECORDED ON FTR EQUIPMENT,
                     STENOGRAPHICALLY TAKEN
13              AND TRANSCRIBED THEREAFTER

14

15                    PRELIMINARY HEARING
                            AND
16                    DETENTION HEARING

17

18                    * * * * * * * * * *

19

20    BEFORE:          The Hon. Susan Russ-Walker
21
      HEARD AT:        Montgomery, Alabama
22
      HEARD ON:        November 7, 2005
23
      APPEARANCES:     Clark Morris, Esq.
24                     Bruce Maddox, Esq.
                       Susan James, Esq.
25                     Don Madison, Esq.
```

MITCHELL P. REISNER, CM, CRR - (334) 265-2500
Official U. S. District Court Reporter
TOTAL COMPUTERIZED LITIGATION SUPPORT & INSTANT TRANSLATION

DEFENDANT'S EXHIBIT 4

Grice1~1
```
 3   whose burden it is.  Y'all remember also, please,

 4   whose burden it is.

 5              MS. MORRIS:  Yes, Your Honor.

 6              THE COURT:  Okay.  We'll go ahead with the

 7   Government.

 8              MS. MORRIS:  Yes, Your Honor.  The

 9   Government calls Agent Scotty Rogers.

10              THE COURT:  Edwards?

11                   S C O T T    E D W A R D S,

12   the witness herein, having first been duly sworn or

13   affirmed to tell the truth, was examined and testified

14   as follows:

15                        DIRECT EXAMINATION

16              BY MS. MORRIS OF SCOTT EDWARDS:

17   Q    Could you state your correct name for the Court,

18   please.

19   A    Scott Edwards.

20   Q    And, Agent Edwards, are you a task force officer

21   with the H. I. D. T. A. task force?

22   A    Yes, ma'am.

23   Q    And that stands for the High Intensity Drug

24   Trafficking Area task force, is that correct?

25   A    Yes, ma'am.
```

MITCHELL P. REISNER, CM, CRR - (334) 265-2500
Official U. S. District Court Reporter
TOTAL COMPUTERIZED LITIGATION SUPPORT & INSTANT TRANSLATION

Page No. 7

```
 1   Q    You're also a police officer with the Montgomery

 2   Police Department, is that correct?

 3   A    Yes.
```

Grice1~1

```
 4   Q   Detailed to the H. I. D. T. A. task force?
 5   A   Yes, ma'am.
 6   Q   And in the course of your duties -- Well let me
 7   back up.  Are you with any special unit with the
 8   Montgomery Police Department?
 9   A   I'm with the Special Operations Division unit,
10   Narcotics Bureau.
11   Q   And as a Special Ops or narcotics officer, as
12   well as a H. I. D. T. A. task force officer, did you
13   come to investigate I guess initially a Mr. Preston
14   Grice?
15   A   Yes, ma'am.
16   Q   Did you obtain information about Mr. Grice?
17   A   Yes, ma'am.
18   Q   When was that?
19   A   That was on November 1st of this year.
20   Q   And what information did you obtain?
21   A   I was informed by Detective Robert Stillman and
22   Special Agent Neil Thompson that they received
23   information from a confidential source that Preston
24   Grice was storing and distributing a large quantity of
25   cocaine from an address on Holcombe Street, later
```

Page No. 8

```
 1   identified at Five eight nine Holcombe Street.
 2           THE COURT:  You're saying "Holcombe Street"?
 3           THE WITNESS:  H-o-l-c-o-m-b-e.
 4   A   The C. S. also stated a subject by the name of
```

Page 7

Grice1~1
22          MS. MORRIS:  I have nothing further.

23          THE COURT:  All right.  We'll have cross

24   examination.  Unless you all prefer to go in some

25   other order, and Miss James is getting up, I was going

MITCHELL P. REISNER, CM, CRR - (334) 265-2500
Official U. S. District Court Reporter
TOTAL COMPUTERIZED LITIGATION SUPPORT & INSTANT TRANSLATION

Page No. 26

1    to suggest we go by the order of the indictment.  You

2    want to --

3          MS. JAMES:  Mr. Madison has a bad throat, so

4    he asked that I go first, if that's okay with the

5    Court.

6          THE COURT:  Miss James can proceed on behalf

7    of Mr. Woods.

8                    CROSS EXAMINATION

9            BY MS. JAMES OF SCOTT EDWARDS:

10   Q    Is it Detective Edwards?

11   A    Yes, ma'am.

12   Q    I'm Susan James.  We've met before?

13   A    Yes, ma'am.

14   Q    I have a few questions on behalf of Mr. Woods.

15          During the beginning of your testimony you

16   indicated that you all had received some information

17   from some source that there were drugs being stored in

18   this house on Holcombe Street, is that correct?

19   A    Yes, ma'am.

20   Q    And based on that you all set up some

21   surveillance outside the residence for, I guess, so

22   you and other law enforcement officers could see it,

Page 25

Grice1~1

| 13 | CROSS EXAMINATION |
| 14 | BY MR. MADDOX OF SCOTT EDWARDS: |
| 15 | MR. MADDOX: Do you mind |
| 16 | (Inaudible) |
| 17 | THE COURT: Not a bit. Go ahead. |

18  Q    Mr. Edwards, I first wanted to ask you a little
19  bit more about the search warrant and the information
20  that it was based upon. Did I understand you
21  correctly to say that the information you got from an
22  informant, or that Stillman got from an informant was
23  basically hearsay and that the informant said somebody
24  told me this?

25  A    Yes, sir.

MITCHELL P. REISNER, CM, CRR - (334) 265-2500
Official U. S. District Court Reporter
TOTAL COMPUTERIZED LITIGATION SUPPORT & INSTANT TRANSLATION

Page No. 48

1  Q    Okay. So it wasn't an informant who was reliable
2  and had seen it or anything, he had just been told
3  that things were going on from that house, is that
4  right?

5  A    No. The informant is reliable, but he had not
6  personally seen it.

7  Q    All right, sir.

8          Did you have any basis, other than the
9  hearsay that you got from the informant, to believe
10  there were any narcotics in that house at that
11  particular time when he told Stillman that?

12  A    Yes, sir.

13  Q    What?

Grice1~1

14    A    The basis was once Detective Stillman and Agent
15    Thompson had received this information, Agent Thompson
16    ran Mr. Grice through a database. It showed that Mr.
17    Grice was a person that is a known trafficker, and he
18    ran his criminal history. The information that the C.
19    S. gave Detective Stillman once Detective Stillman
20    went by and verified the information that the C. S.
21    had given him, and then surveillance was set up.
22              The C. S. stated Mr. Woods -- or gave a
23    nickname at that point. At that time he would be
24    driving a Cadillac. The Cadillac was there. The
25    black truck was parked in front of the residence, and

MITCHELL P. REISNER, CM, CRR - (334) 265-2500
Official U. S. District Court Reporter
TOTAL COMPUTERIZED LITIGATION SUPPORT & INSTANT TRANSLATION

Page No. 49

1    that once Mr. Woods left, the traffic stop was
2              (Inaudible)
3    Q    I'm not sure that's what I asked you, but I'll
4    try again.
5    A    Oh, okay. I'm sorry.
6    Q    The question is this: At the time the informant
7    gave that information, was there any other reason to
8    believe, at the time he gave the information, any
9    other reason to believe that there was actually
10    narcotics at that residence at the time he said that?
11    A    Just one -- The databases, and to run the
12    criminal history and things of that nature, and
13    confirming what he. saw. Detective Stillman and Agent
14    Thompson believed the C. S. was being truthful.
Page 47

Grice1~1

15  Q    All right, sir.  But that was obtained after he

16  said it?

17  A    Yes, sir, after he said it.

18  Q    Okay.  About what time did he give that

19  information?

20  A    I don't know what time it was.  I know it was

21  midmorning around eleven o'clock whenever he contacted

22  Detective Stillman.

23  Q    So it seemed

24            (Inaudible)

25  information?

MITCHELL P. REISNER, CM, CRR - (334) 265-2500
Official U. S. District Court Reporter
TOTAL COMPUTERIZED LITIGATION SUPPORT & INSTANT TRANSLATION

Page No. 50

1   A    Yes, sir.

2   Q    Okay.  And you all, I think you said, started

3   your surveillance and investigation about noon?

4   A    Yes, sir, it was shortly after he had received

5   the phone calls.

6   Q    Okay.  And that investigation consisted, I think

7   you said, of running a record on Mr. Grice?

8   A    Yes, sir.

9   Q    Okay.  But at that time you hadn't seen Mr. Grice

10  at the house, had you?

11  A    No, sir.

12  Q    Did you have anything to connect Mr. Grice to

13  that house at that point in time other than the

14  information from the informant?

15  A    No, sir, I don't believe so.

Page 48

Grice1~1

20    him to the narcotics office.

21    Q    Okay.  So Mr. Grice was stopped and transported

22    to the narcotics office?

23    A    Yes, sir.

24    Q    And narcotics were found on him?

25    A    No, sir.

MITCHELL P. REISNER, CM, CRR - (334) 265-2500
Official U. S. District Court Reporter
TOTAL COMPUTERIZED LITIGATION SUPPORT & INSTANT TRANSLATION

Page No. 55

1    Q    What was he under arrest for then?

2    A    We were in the process of -- Actually, while this

3    is going on, the search warrant is being drafted to be

4    presented to the judge.

5    Q    Okay.  So what was he under arrest for?

6    A    He was just under investigative detention at this

7    time.

8    Q    So he's transported before the search warrant is

9    finished, is that right?

10   A    Yes, sir.

11   Q    What's the next thing that happened?

12   A    Shortly after we go and we execute the search

13   warrant.

14   Q    Okay.  Now where was Mr. Harvey at the time Mr.

15   Grice was being transported?

16   A    I do not know where his exact location was.

17   Q    Had he been taken into custody?

18   A    Mr. Harvey?  At that time, no, sir.

19   Q    I'm a little confused.  You said that Mr. Grice,

20   while the search warrant was being prepared to present

Page 53

```
 1   actually had the mileage, you did testify that it was
 2   the person that knew the C. S. and not the C. S. that
 3   actually provided the information, is that correct?
 4   A    No, the C. S. provided the information to
 5   Detective Stillman and Agent Thompson.  But the C. S.
 6   received the information from someone else.
 7   Q    Right.  And that was not personal knowledge that
 8   the C. S. had on his or her own?
 9   A    Correct.
10   Q    And that information was told to the C. S., and
11   then the C. S. then in turn told it to someone else,
12   is that correct?
13   A    Yes, he told it to Detective Stillman and Agent
14   Thompson.
15   Q    So it was two times, three times removed from the
16   original source, is that correct?
17   A    Yes, sir.
18   Q    Now Mr. Grice, I believe you testified, made the
19   statement that he was at the house to clean fish and
20   cook fish, is that correct?
21   A    Correct.
22   Q    Did any of the agents, or did you ask any of the
23   agents who were surveiling, performing surveillance on
24   the house whether or not they saw Mr. Grice cleaning
25   fish on the porch of the house during the time that
```

MITCHELL P. REISNER, CM, CRR - (334) 265-2500
Official U. S. District Court Reporter
TOTAL COMPUTERIZED LITIGATION SUPPORT & INSTANT TRANSLATION

Page No. 66

Page 63

Grice1~1

1 Q    Okay. The utility bills weren't even in Mr.

2 Grice's name, were they?

3 A    No, sir.

4 Q    The only things that you linked to Mr. Grice

5 whatsoever is this key that you said that he had to

6 the house.

7 A    And the statement of Mr. Wright.

8 Q    And the statement of Mr. Wright. And what was it

9 that Mr. Wright said?

10 A    He stated that any time he wanted to go find and

11 see Mr. Grice, that that's the address he always went

12 to.

13 Q    And how did you determine that that was what Mr.

14 Wright had -- How many times did you determine that

15 Mr. Wright had gone over there to see Mr. Grice at

16 that residence?

17 A    He didn't give a specific number of times.

18 Q    You're aware whether or not Mr. Grice was

19     (Inaudible)

20 with the persons he

21     (Inaudible)

22 buy the house?

23 A    Yes, sir.

24 Q    When Mr. Grice was pulled over, what traffic

25 laws, if any, had he violated?

MITCHELL P. REISNER, CM, CRR - (334) 265-2500
Official U. S. District Court Reporter
TOTAL COMPUTERIZED LITIGATION SUPPORT & INSTANT TRANSLATION

Page No. 68

1 A    He was stopped for investigative purposes.

Page 65

Grice1~1
2  Q    Okay.  So there was no traffic violation that
3  you're aware of that he had committed at the time that
4  he was pulled over?
5  A    No, sir.
6  Q    Where was Mr. Grice at the time that he was
7  pulled over?
8  A    I believe he was on Court Street.  I'm not a
9  hundred percent sure.
10  Q    Approximately how far from the residence was
11  that?
12  A    Two, three blocks.
13  Q    Now I noted by your earlier testimony you talked
14  about a black pickup truck and Cadillac, I believe,
15  that was at the residence.  I did not hear you make
16  any statements or testify about a van.  What sort of
17  vehicle was Mr. Grice driving?
18  A    When he left the residence he was in a van.
19  Q    Where was that van parked?
20  A    I do not know.
21  Q    Approximately what time was it that you pulled
22  over, or that Mr. Grice was pulled over?
23  A    I don't remember the time.  I don't recall the
24  time.
25  Q    Do you know who affected the stop of Mr. Grice?

MITCHELL P. REISNER, CM, CRR - (334) 265-2500
Official U. S. District Court Reporter
TOTAL COMPUTERIZED LITIGATION SUPPORT & INSTANT TRANSLATION

Page No. 69

1  A    Yes, sir, it was Sergeant Pace.
2  Q    And was Sergeant Pace one of the officers who was

Page 66

Grice1~1

```
 1                    * * * * * * * * * *

 2

 3                    COURT REPORTER'S CERTIFICATE

 4

 5            I certify that the foregoing is a correct

 6    transcript from the record of proceedings in the

 7    above-entitled matter as prepared by me to the best of

 8    my ability.

 9

10            I further certify that I am not related to

11    any of the parties hereto, nor their counsel, and I

12    have no interest in the outcome of said cause.

13

14            Dated this 3rd day of December 2005.

15

16                         _____
                           MITCHELL  P.  REISNER,  CM, CRR,
17                         Official US Dist. Court Reporter
                           Registered Professional Reporter
18                         Certified  Real-Time  Reporter

19

20

21

22

23

24

25
```

MITCHELL P. REISNER, CM, CRR - (334) 265-2500
Official U. S. District Court Reporter
TOTAL COMPUTERIZED LITIGATION SUPPORT & INSTANT TRANSLATION

Page 125

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 7

| 1 Program Code HID100 | 2 Cross File | Related Files | 3 File No. | 4. G-DEP Identifier |
|---|---|---|---|---|
| 5 By: TFO Scott Edwards At Montgomery, Alabama | ☒ ☒ ☒ ☒ ☐ | 50 | 6. File Title | |
| 7. ☐ Closed ☐ Requested Action Completed ☐ Action Requested By: | | | 8. Date Prepared 08/21/06 | |

9 Other Officers: Montgomery Police Detective Robert Steelman

10. Report Re. Proffer Interview of Leenandora WOODS on August 15, 2006

### SYNOPSIS

On August 15, 2006, TFO Scott Edwards and Montgomery Police Detective Robert Steelman met with Leenandora WOODS. The purpose of this meeting was for WOODS to enter into a proffer agreement with the government. WOODS' attorney, Mrs. Susan James, was also present. The following details the interview.

### DETAILS

1. Reference is made to all Reports of Investigation written to this same case file title and number.

2. On August 15, 2006, Leenandora WOODS entered into a proffer agreement with the government. WOODS stated he started selling cocaine at seventeen years of age. WOODS was purchasing one-quarter ounces and half ounces of crack and powder cocaine from Preston GRICE, George JONES and Dandre STOKES. GRICE would sometimes stop selling cocaine for a couple of months and then start again.

3. WOODS and GRICE are distant cousins and WOODS has known GRICE all of his life. WOODS would purchase a half ounce or quarter ounce of cocaine from GRICE two times a week. GRICE charged WOODS $350 for a half ounce and $200 for a quarter ounce.

| 11 Distribution: Division NOFD | 12. Signature (Agent) TFO Scott Edwards | 13. Date 08/21/06 |
|---|---|---|
| District Other SARI | 14. Approved (Name and Title) Michael Bulgrin Group Supervisor | 15. Date 08/21/06 |

DEA Form - 6
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

DEFENDANT'S EXHIBIT 5

3 - Originating Office

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | | | | Page 1 of 2 |
|---|---|---|---|---|

| 1. Program Code<br>HID100 | 2. Cross File | Related Files | 3. File No. | 4. G-DEP Identifier |
|---|---|---|---|---|
| 5. By: SA NEILL THOMPSON<br>At: MONTGOMERY, AL | ☐ ☐ ☐ | | 6. File Title | |
| 7. ☐ Closed ☐ Requested Action Completed<br>☐ Action Requested By: | ☐ ☐ | | 8. Date Prepared<br>12/05/05 | |
| 9. Other Officers: IA Wade Parker | | | | |

10. Report Re: INterview of Tarsus LANIER regarding Preston GRICE   (A)

## DETAILS

1. Reference is made to all other previous Reports of Investigation written to this same case file title and number.

2. On December 5, 2005 SA Neill Thompson and IA Wade Parker interviewed Tarsus LANIER at the Elmore County Jail, where he is being held on federal charges. Also present was LANIER'S attorney, Susan James, and the interview was conducted pursuant to a proffer agreement between LANIER and Assistant United States Attorney Terry Moorer.

3. LANIER primarily talked about Preston GRICE and previous transactions that LANIER had conducted with GRICE. LANIER stated that several years ago GRICE sold "crack" cocaine in the Riverside neighborhood. LANIER bought "crack" cocaine from GRICE several times, in $100 and $200 quantities which LANIER "broke down" further and distributed.

4. Approximately two years before LANIER'S arrest LANIER began purchasing large quantities of cocaine from GRICE. LANIER would call GRICE on his cellular telephone and GRICE would always tell him to come to the LAICOS CLUB. LANIER began purchasing one kilogram of cocaine at a time, for $20,000.00. LANIER purchased cocaine from GRICE for approximately 2 years, for a total of 5 - 10 times, and

| 11. Distribution:<br>Division | 12. Signature (Agent)<br><br>SA NEILL THOMPSON | | 13. Date<br>12-5-05 |
|---|---|---|---|
| District<br><br>Other   SARI | 14. Approved (Name and Title)<br>MARSHALL SIMONS<br>GROUP SUPERVISOR | | 15. Date<br>1/2/5/05 |

DEA Form      - 6
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

DEFENDANT'S EXHIBIT 6

NT, INTERVIEW OF TARSUS LANIER
1 - Prosecutor

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned

18'